# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANELLE L. DAVIS,<br><br>      Plaintiff,<br><br>v.<br><br>JO ANNE B. BARNHART, Commissioner<br>of Social Security,<br><br>      Defendant. | 1:03cv6543 OWW DLB<br><br>FINDINGS AND RECOMMENDATION<br>REGARDING PLAINTIFF'S SOCIAL<br>SECURITY COMPLAINT |

## **BACKGROUND**

Plaintiff Janelle L. Davis ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted without oral argument to the Honorable Dennis L. Beck, United States Magistrate Judge, for findings and recommendation to the District Court.

## **FACTS AND PRIOR PROCEEDINGS**[1]

Plaintiff filed an application for disability insurance benefits on August 31, 2001. AR 91, 93-99. She alleged that she had been disabled since October 31, 2000, due to back, neck and

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

1   shoulder pain, anxiety, and irritable bowel syndrome.  AR 112.  After being denied both initially

2   and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge

3   ("ALJ").  AR 71-74, 76-79, 80.  On April 22, 2003, ALJ Michael Haubner held a hearing.  AR

4   32-63.  On May 27, 2003, ALJ Haubner found that Plaintiff was not disabled.  AR 10-20.  On

5   September 17, 2003, the Appeals Council denied review.  AR 4-6.

6       Hearing Testimony

7         On April 22, 2003, ALJ Haubner held a hearing in Fresno, California.  AR 32.  Plaintiff

8   appeared with her attorney, Dennis Bromberg.  AR 32.  Vocational expert ("VE") Jose Chaparro

9   also appeared and testified.  AR 32.

10       Plaintiff testified that she was 42 years old at the time of the hearing.  AR 38.  She

11   completed the twelfth grade and had training in cosmetology and cooking.  AR 38-39.  She

12   worked as a dietary cook from 1989 through October 2000.  AR 39.

13       She lives with her 16 year old daughter.  AR 40.  She has a drivers' license and drives

14   about five times per week.  AR 40.  She takes care of her own personal needs and cooks meals

15   about three times a week.  AR 41.  She prepares simple meals about twice a day.  AR 41.  She

16   goes shopping about once a month.  AR 41.  She does not do any housework.  During the day,

17   she crochets about two hours and watches television for about five hours.  AR 42.  She spends

18   about an hour a day walking, but not all at once.  AR 42.  She thought she could walk for about

19   20 minutes at one time.  AR 43.  She goes to church about three times a month and goes out to

20   eat about twice a month.  AR 43.  She last cooked for her grandparents about six months ago.

21   AR 43.  She does the dishes once a day.  AR 43.

22       Plaintiff explained that she sees a psychiatrist every three months, and a counselor.  AR

23   44.   She last had thoughts of suicide or hurting others about five years ago.  AR 45.  She

24   believes that she has ongoing mental problems and explained that she gets claustrophobic easily,

25   is nervous around people and crowds, and has a very short short-term memory.  AR 47.

26       She has had sciatica on her left side for about six months and takes medication for it.  AR

27   46.  Some of the medications help control the pain.  AR 46.  She indicated that her sciatica,

28   fibromyalgia and left shoulder problems make her disabled.  AR 47.  She explained that she has

2

1    had surgery on both shoulders, but that the fibromyalgia has "set in" to her left shoulder and it

2    hurts all the time.  AR 47.

3         She thought she could lift and carry about five pounds.  AR 47.  She thought she lifted 10

4    pounds about twice a month.  AR 48.  She estimated that she could be on her feet for about 30

5    minutes at one time.  AR 48.  She sits or lays down most of the day.  AR 48.  She has to lay

6    down for about six hours during the day because her back hurts.  AR 48.  She thought she could

7    sit down for an hour at a time before having to move.  AR 48.

8         When questioned by her attorney, Plaintiff explained that the sciatica on her left side is

9    always there and runs down her left leg to her foot.  AR 49.  It also runs down her right leg to her

10   foot about four times per week.  AR 49.  She indicated that she had back pain in her whole back,

11   but that her lower back was worse because of her sciatica.  AR 50.  Her back pain is worse than

12   her leg pain.  AR 50.  Standing makes her lower back worse, and laying down helps.  AR 50.

13   There is never a time that she is without pain.  AR 50.  She believed that her pain affects her

14   ability to concentrate and pay attention.  AR 50.  She estimated that she could maintain her

15   concentration for 20 to 30 minutes at a time.  AR 51.

16        Her irritable bowel syndrome is still a problem, and causes constipation and pain in her

17   stomach and abdomen.  AR 51.  Prior to causing constipation, it caused diarrhea all the time, and

18   Plaintiff needed to use the restroom eight to ten times per day.  AR 52.

19        The ALJ asked the VE to assume that the person in all hypothetical questions was the

20   same age as Plaintiff, and had the same educational and work background.  AR 55.  The first

21   hypothetical assumed a person who could lift and carry 50 pounds occasionally, 25 pounds

22   frequently, but should avoid constant, forceful gripping with the right hand.  AR 55.  This person

23   could not perform Plaintiff's past relevant work as she performed it, but could perform the jobs

24   of housekeeping/cleaner (14,000 in California and 127,300 nationally), agricultural produce

25   sorter (3,000 in California and 7,200 nationally) and office helper (2,600 in California and

26   25,400 nationally).  AR 55.  If this person was also precluded from complex tasking (moderately

27   limited in the ability to understand, remember and carry out detailed tasking), this person could

28   perform the jobs of housekeeper/cleaner and agricultural sorter.  AR 56.

1    The second hypothetical assumed a person who could lift and carry five pounds

2    frequently, 10 pounds occasionally, could sit for 30 minutes at a time for four hours in an eight

3    hour workday, could stand for 30 minutes at a time for three hours in an eight hour workday, but

4    had restrictions in stooping, bending, squatting and reaching with the left upper extremity, and

5    who was unable to maintain consistent concentration.  This person would not be able to work.

6    AR 55-58.

7    The third hypothetical assumed a person who would be moderately limited in the ability

8    to understand very short and simple instructions, and detailed instructions, moderately limited in

9    the ability to maintain attention and concentration, the ability to work in coordination and

10   proximity to others without being distracted, and the ability to respond to changes in the work-

11   like setting.  AR 59.  This person could not perform any work.  AR 59.

12   Medical Record

13   _____A September 19, 2000, MRI of Plaintiff's left shoulder revealed mild impingement.  AR

14   374.

15   _____Beginning in January 2001, Plaintiff received mental health treatment from the Kings

16   View Mariposa Counseling Center.  AR 235.  At that time, she indicated that she and her

17   daughter moved to Mariposa to take care of her grandfather.  AR 235.  A licensed clinical social

18   worker diagnosed panic disorder without agoraphobia, anxiety disorder not otherwise specified

19   and dysthymic disorder and recommended referral to a staff psychiatrist.  AR 236.

20   _____In February 2001, Plaintiff began treatment with David Dunnington, M.D.  AR 372.

21   Plaintiff reported diagnoses of chronic left shoulder pain, chronic back pain, chronic pain

22   syndrome, diabetes, anxiety, depression, hypothyroidism, hyperlipidemia, hypertension, and

23   irritable bowel syndrome.  Upon examination, Plaintiff appeared healthy, heavyset and in no

24   acute distress.  AR 372.

25   X-rays of Plaintiff's spine taken on March 7, 2001, revealed mild degenerative disc

26   changes in her lumbosacral spine.  AR 369.  Findings in her cervical spine may indicate early

27   degenerative changes.  AR 369.  X-rays of Plaintiff's right shoulder were normal, but x-rays of

28   her left shoulder revealed calcific tendinitis.  AR 368.

4

1    _____On March 13, 2001, Plaintiff was evaluated by Kings View psychiatrist Danilo Chang,

2    M.D.  AR 229.  He diagnosed dysthymic disorder, anxiety disorder, and rule out panic disorder.

3    AR 231.  He recommended medications and counseling.  AR 231.  Plaintiff continued her

4    treatment at Kings View through February 2003.  AR 208-237, 492-509.  Plaintiff's mental status

5    examinations during that time revealed mostly intact findings that were within normal limits.

6    AR 209, 215, 217, 220, 225, 500, 501, 503, 505, 507-508.

7    _____On March 13, 2001, Plaintiff saw Dr. Dunnington for back and neck pain after falling off

8    a bucking horse.  AR 361.  He noted that Plaintiff's pain medications provided adequate relief

9    and recommended physical therapy and that she continue to wear the cervical collar she was

10   given at the emergency room.  AR 361.  On March 29, 2001, Dr. Dunnington wrote Plaintiff a

11   prescription for a TENS unit for pain management.  AR 359.  On that day, Plaintiff stated that

12   she felt better overall, but she still had pain in the left shoulder.  AR 358.

13   _____Plaintiff was evaluated by James R. Schneider, M.D., on April 21, 2001.  AR 191.  She

14   complained of pain in her right hand and wrist that began in December 2000.  AR 191.  After

15   examination, he diagnosed right hand and wrist tendinitis and recommended physical therapy and

16   medication.  AR 193.

17          In April and May 2001, Plaintiff underwent physical therapy for neck, shoulder and upper

18   back pain.  AR 249-262.  Plaintiff had progressed well upon discharge and indicated that she was

19   confident and comfortable with her home program.  AR 249.

20          A June 2001 electrodiagnostic study of Plaintiff's upper extremities revealed evidence of

21   a borderline right wrist carpal tunnel syndrome.  AR 195.

22          In June 2001, Dr. Dunnington referred Plaintiff to the Stanford Pain Management Center.

23   AR 198-206.  Upon examination, she was diagnosed with left shoulder impingement.  AR 204.

24   The Center recommended physical therapy, general reconditioning exercises for muscle strength

25   and weight loss.  AR 198.  From a psychological point of view, pain psychologist Dr. Adams

26   found a long-standing depression with anxiety features and recommended that Plaintiff continue

27   her psychiatric and psychological treatment, and receive education regarding pain management

28

1   skills, coping strategies, possible biofeedback, and physical endurance and reconditioning.  AR
2   198.
3        In July 2001, Plaintiff saw Sam B. Tacke, M.D. for evaluation of her right hand pain.  AR
4   303.  He recommended right carpal tunnel release, and on August 7, 2001, the procedure was
5   performed.  AR 303, 290.
6        On July 31, 2001, Plaintiff saw Dr. Dunnington.  AR 353.  He assessed left shoulder
7   impingement syndrome and chronic pain, stable.  AR 353.  She indicated that her medications
8   (Vioxx and Vicodin) were a "good combination."  AR 353.
9        Plaintiff underwent physical therapy in September 2001 for her right hand.  AR 239-248.
10  Upon discharge, the therapist noted that Plaintiff had progressed quite well and was competent
11  with her home exercise program.  AR 240.
12       On October 2, 2001, Dr. Tacke noted that Plaintiff had an excellent response to the right
13  carpal tunnel release and had no residual disability as a result of her carpal tunnel syndrome.  AR
14  283.  He opined that she could return to work without restriction.  AR 283.
15       On November 30, 2001, Plaintiff returned to Dr. Dunnington for evaluation of her left
16  shoulder pain.  AR 333.  She indicated that her medications provided adequate pain relief.  AR
17  333.  She also indicated that she was doing therapy on her own at home and had increased her
18  range of motion.  AR 333.
19       On December 23, 2001, Plaintiff saw consultive examiner Jay Dhiman, M.D., for
20  evaluation of her neck, shoulder and back pain.  AR 263.  Upon examination, he described her as
21  an obese female in no acute distress.  AR 264.  She had full range of motion in both shoulders,
22  with minimal pain.  AR 266.  She had tenderness in the anterior aspect of both shoulders, the
23  trapezius musculature area, and parts of the spine.  AR 266.  He diagnosed her with a history of
24  bilateral shoulder injury, upper and lower back pain likely caused by osteoarthritis, diabetes,
25  hypertension, hypothyroidism, and a history of anxiety and depression.  AR 266.  He opined that
26  she had no limitations in standing, walking or sitting.  AR 266.  She could lift 20 pounds
27  frequently and 50 pounds occasionally.  AR 267.  She had no postural, manipulative or
28  environmental limitations.  AR 267.

1  On January 9, 2002, Plaintiff returned to Dr. Tacke, complaining of right hand pain which
2  was aggravated by repetitive work.  AR 280.  He recommended physical therapy but indicated
3  that Plaintiff could continue her regular work duty.  AR 280.

4  On January 19, 2002, Plaintiff saw consultive examiner Charles House, Ph.D., for a
5  comprehensive psychological evaluation.  AR 268.  Plaintiff complained of depression and
6  anxiety.  AR 269.  Plaintiff indicated that she takes care of her grandparents and her daughter,
7  and does as much as she can even though she hurts.  AR 270.  Plaintiff scored a perfect 30 on a
8  mini-mental status examination, indicating intact cognitive functioning with no evidence of an
9  impairment in concentration, attention, or memory.  AR 271.  She was able to maintain good
10 concentration, persistence and pace.  AR 272.  He diagnosed depressive disorder, not otherwise
11 specified.  AR 273.  Dr. House opined that Plaintiff would have no difficulty with work
12 activities.  AR 274.

13 On January 22, 2002, Plaintiff saw Dr. Dunnington for persistent upper back mid-
14 shoulder pain and indicated that she was not getting as much pain relief from her medications.
15 AR 326.  Dr. Dunnington said he would refer her again to the Stanford Pain Clinic.  AR 327.  He
16 instructed Plaintiff to increase her Vicodin, use moist heat, perform activity as tolerated, and
17 continue her home therapy exercises.  AR 327.

18 Plaintiff saw Dr. Dunnington in February 2002 for an evaluation of her diabetes.  AR
19 322.  She indicted that she felt well overall and that her chronic pain is stable most of the time on
20 her current medications.  AR 322.  Her diabetes and hypertension were also stable.  AR 323.  Dr.
21 Dunnington noted that Plaintiff looked great.  AR 323.

22 On February 7, 2002, a State Agency physician completed a Physical Residual Functional
23 Capacity Assessment form.  AR 401.  He opined that Plaintiff could lift and/or carry 50 pounds
24 occasionally and 25 pounds frequently, could stand/walk about 6 hours in an eight-hour workday,
25 could sit about six hours in an eight-hour workday, and was unlimited in pushing and pulling.
26 AR 402.

27 On February 8, 2002, a State Agency physician completed a Psychiatric Review
28 Technique form and opined that Plaintiff's affective disorder and anxiety-related disorders were

1    non-severe.  AR 411.  He thought Plaintiff would be mildly limited in activities of daily living,

2    maintaining social functioning and maintaining concentration, persistence and pace.  AR 421.

3         On March 7, 2002, Plaintiff saw Dr. Tacke and complained of right wrist and thumb pain,

4    but indicated that her symptoms seem a little better with the use of a thumb splint.  AR 276.

5         On March 20, 2002, a State Agency physician completed a Physical Residual Functional

6    Capacity Assessment form.  AR 375.  He opined that Plaintiff could lift and/or carry 50 pounds

7    occasionally and 25 pounds frequently, could stand/walk about 6 hours in an eight-hour workday,

8    could sit about six hours in an eight-hour workday, and was unlimited in pushing and pulling.

9    AR 376.  Plaintiff had to avoid constant forceful gripping with her right hand.  AR 378.

10        On March 24, 2002, Plaintiff was examined by Dr. Dunnington while hospitalized for

11   chest pain.  AR 320.  She stated that she was having much less musculoskeletal pain.  AR 320.

12   Dr. Dunnington diagnosed resolving myofascial strain, chest pain, with no evidence of an acute

13   myocardial event, fibromyalgia, type II diabetes and stable hypertension.  AR 320.

14        In April 2002, Dr. Dunnington diagnosed Plaintiff with sleep apnea and recommended a

15   sleep study.  AR 317.  He noted that Plaintiff looked great and had been continuing to lose

16   weight.  AR 317.

17        In June 2002, Plaintiff was diagnosed with moderate obstructive sleep apnea and likely

18   restless leg syndrome.  AR 483.

19        In August 2002, Plaintiff complained of low back pain radiating down the left leg four

20   times per day.  AR 477.  She was given a pain injection.  AR 477.  On August 19, 2002, Dr.

21   Dunnington noted that Plaintiff was fairly stable on a combination of medications.  AR 469.  She

22   received morphine injections in the emergency room during a back pain flare-up, which worked

23   well.  AR 469, 481.  He diagnosed persistent back pain, left sciatica, with pain well controlled,

24   fatigue and sleep apnea.  AR 469.

25        X-rays of Plaintiff's lumbosacral spine taken on August 7, 2002, revealed mild

26   degenerative disc disease at L5-S1.  AR 476.

27        On August 20, 2002, State Agency physician Maria Merando, M.D., completed a

28   Psychiatric Review Technique form and opined that Plaintiff's affective disorder was non-severe.

1   AR 387.  She thought Plaintiff would be mildly limited in activities of daily living, maintaining

2   social functioning and maintaining concentration, persistence and pace.  AR 397.

3        Plaintiff saw Dr. Dunnington on September 18, 2002, and complained of mid-low back

4   pain with occasional pulses of electric jolts down her left leg.  Dr. Dunnington noted that an MRI

5   confirmed left sciatica.  AR 466.  Plaintiff indicated that she could only wash dishes and that her

6   daughter did the rest.  AR 466.  She was preparing for a trip to Hawaii, which her parents

7   arranged to thank her for caring for her grandparents.  AR 466.

8        After returning from her trip, Plaintiff said she felt good and was sleeping well.  AR 494.

9        In October 2002, Dr. Dunnington described Plaintiff's polymyalgia as stable.  AR 453.

10       On December 3, 2002, Dr. Dunnington noted that Plaintiff seemed to be deteriorating,

11  especially regarding her pain in her left lower extremity.  AR 447.  Plaintiff indicated that she

12  could not ride or drive in a car more than 30 minutes without being "in bed" for three days.  AR

13  447.  She did, however, indicate that the medication Norco afforded relief and denied any side

14  effects with her current medical regime.  AR 447.  Dr. Dunnington assessed myofascial pain

15  syndrome C-spine and L-spine, refractory pain and progressive left sciatica.  AR 447.  He

16  increased the Vicodin strength and suggested Plaintiff avoid sitting or standing more than 30

17  minutes and avoid lifting and twisting.  AR 448.

18       Plaintiff returned to Dr. Dunnington on December 30, 2002.  AR 444.  She indicated that

19  the Norco generally worked well and that the injection she received at the last visit helped with

20  her back pain.  AR 444.  He assessed acute chronic myofascial pain syndrome low back and mid

21  back.  AR 444.  He suggested Plaintiff avoid lifting, twisting, bending over, stooping, sitting or

22  standing more than 30 minutes at a time.  AR 445.  She received another pain injection with

23  some relief.  AR 445.

24       On April 13, 2003, Cheryl Diamond, M.D., who treated Plaintiff at Kings View,

25  completed a Mental Assessment form.  AR 513.  She opined that Plaintiff was moderately

26  limited in her ability to understand and remember simple and detailed instructions.  AR 513.

27  While she wasn't limited in her ability to carry out very short and simple instructions, she was

28  slightly limited in carrying out detailed instructions.  AR 514.  She was moderately limited in her

ability to maintain attention and concentration for extended periods and in her ability to work in coordination within a proximity to others without being distracted. AR 514. She was slightly limited in her ability to interact with the general public and moderately limited in her ability to respond appropriately to changes in the work setting. AR 514-515.

On April 13, 2003, Dr. Dunnington assessed Plaintiff's functional limitations in response to a request from Plaintiff's attorney. AR 510-512. He diagnosed refractory back pain, degenerative disc disease, left shoulder tendinitis, diabetes and obstructive sleep apnea. AR 510. He described her prognosis as poor and indicated that her condition significantly affects her ability to do work related activities. AR 511. He believed she could sit for 30 minutes at a time, for a total of four hours per day, could be on her feet for 30 minutes at a time, for a total of three hours per day, and could lift and carry five pounds frequently and 10 pounds occasionally. AR 511. He also indicated that she had restrictions in bending, stooping, squatting and reaching, and was restricted with regard to repetitive use of her left upper extremity. AR 511. Her ability to concentrate was affected by her pain and she could not consistently maintain attention for two hours. AR 512.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of status post right carpal tunnel release, mild impingement of the left shoulder, type II diabetes mellitus, chronic back pain and sciatica. AR 14. He did not find a severe mental impairment. AR 14. He determined that Plaintiff's impairments were not as severe as alleged. AR 17. He gave great weight to the RFC assessment of March 20, 2002 and the opinion of the consultive examiner. AR 17. He gave little weight to Dr. Dunnington's and Dr. Diamond's April 2003 assessments because, although he asked counsel for clarification, he did not receive any. AR 17. He found that Plaintiff retained the RFC to lift and carry 50 pounds occasionally and 25 frequently, but should avoid constant forceful gripping with the right hand. AR 19. Based on this and the VE testimony, the ALJ determined that Plaintiff could perform the jobs of agricultural sorter, housekeeper and office helper. AR 20.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[2]  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (status post right carpal tunnel release, mild impingement of the left shoulder, type II diabetes mellitus, chronic back pain and sciatica) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; (5) but retains the RFC to perform a significant number of jobs in the national economy.  AR 19-20.

Plaintiff argues that (1) the ALJ committed an error of law when he improperly and/or prematurely closed the record, precluding clarification of the alleged ambiguity; and (2) the ALJ's RFC finding is not supported by substantial evidence.

### DISCUSSION

A.   Development of the Record

        Plaintiff argues that the ALJ failed to keep the record open to allow Plaintiff's attorney, Mr. Bromberg, to submit the requested documentation to clarify Dr. Dunnington's and Dr. Diamond's April 2003 assessments.  Plaintiff explains that the ALJ issued his decision 35 days after the hearing, which was an insufficient time to allow her attorney to provide the clarification. Plaintiff contends that the ALJ's failure to develop the record was an error of law and requires remand.  In the alternative, Plaintiff argues that the case should be remanded for review of a newly discovered May 5, 2003, functional capacities assessment prepared by Dr. Dunnington for CalWORKS.

An ALJ has a duty to fully and fairly to develop the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001).  However, the duty only exists where the evidence is ambiguous or when the ALJ determines that "the record is inadequate" to allow for proper evaluation of the

---

[2] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

evidence. *Id.* The ALJ may discharge this duty by keeping the record open after a hearing to allow supplementation of the record. *Id.; Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998).

During questioning of the VE, the ALJ expressed concerns about the opinions expressed by Dr. Dunnington and Dr. Diamond in their April 2003 functional assessments. He indicated that he couldn't define certain limitations imposed by the doctors. AR 56-59. He described the statements as "nebulous." AR 59. As to Dr. Dunnington's opinions, he asked Mr. Bromberg to "find out for me in Exhibit 15 what this doctor means by, cannot consistently maintain attention and concentration." AR 59. He also asked Mr. Bromberg to "find out what they mean by, restricted stooping, bending, squatting and reaching. And also what he means by periodic left upper extremity restriction." AR 59. As to Dr. Diamond's opinions, he asked Mr. Bromberg to find out

> what her qualifications are, what her background is. I need to know what she's basing this stuff on, whether – what kind of onset date. Whether she's got any durational statement on these issues, because these check the blocks are more trouble than they're worth. They confuse the issue in my mind more than they help.

AR 59-60.

In response, Mr. Bromberg explained the difficulty in getting information from treating sources. AR 60. The ALJ then explained that unless he received the requested clarification, he would give little weight to the opinions. AR 60-61. The ALJ closed the hearing and issued his written decision 35 days later. AR 62, 10-20.

Contrary to Plaintiff's contention, the ALJ kept the record open, for over one month, until he issued his decision. This satisfied his duty to develop the record. *Tidwell*, 161 F.3d at 602 (ALJ voiced concerns about inadequacy of form completed by doctor, and satisfied duty to develop the record by holding record open after hearing so that doctor's responses could be supplemented).

Plaintiff contends that 35 day time period was insufficient to allow supplementation, especially where no time limit was indicated during the hearing and Mr. Bromberg explained the difficulty in getting information from treating physicians. However, if any confusion existed at the hearing as to how long the record would be held open, Mr. Blomberg should have requested

1   clarification.  If Mr. Bromberg found that additional time was necessary during that 35-day

2   period, he should have requested additional time.  Indeed, Mr. Bromberg wrote letters to Drs.

3   Dunnington and Diamond two days after the hearing requesting clarification.  Exhibit 1 and 2,

4   attached to Opening Brief.  He received a response from Dr. Diamond on June 6, 2003, after the

5   ALJ issued his decision, and did not receive any response from Dr. Dunnington.  Exhibit 3,

6   attached to Opening Brief.  Certainly, there is no minimum time requirement for which a record

7   be held open.  Here, counsel had a reasonable amount of time, 35 days, within which to provide

8   the supplemental information or request additional time.  While counsel, an experienced Social

9   Security representative,[3] may not have known how long he had, he likely knew about how long

10  an ALJ takes to write a decision and could have planned his actions accordingly.

11          Insofar as Plaintiff requests a remand based on new evidence, her argument fails.

12  Plaintiff argues that Dr. Diamond's June 6, 2003, supplemental report and Dr. Dunnington's May

13  5, 2003, functional assessment completed for CalWORKS[4], constitute new evidence pursuant to

14  42 U.S.C. § 405(g).

15          Pursuant to the provisions of 42 U.S.C. § 405(g), a case may be remanded to the

16  Secretary if the new evidence submitted is material, and there is good cause for the failure to

17  incorporate it into the record.  In order to be "material," the new evidence must be probative of

18  the claimant's condition as it existed during the relevant time period -- on or before the

19  administrative hearing.  *Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 511

20  (9th Cir. 1987).  In addition, the claimant must prove to the reviewing court's satisfaction that

21  there exists a "reasonable possibility that the new evidence would have changed the outcome of

22  the Secretary's determination had it been before him." *Booz v. Secretary of Health and Human*

23  *Services*, 734 F.2d 1378, 1380 (9th Cir. 1984).  The good cause requirement is satisfied if the

24  claimant could not have obtained the medical evidence at the time of the administrative

25

26

27          [3] *See Saelee v. Chater*, 94 F.3d 520 (9th Cir. 1996), where the claimant was represented by "Bromberg and Ishikawa," although by Mr. Ishikawa, Mr. Bromberg's partner.

28          [4] This document is another "check-the-box" form.

14

1  proceeding, even though the evidence surfaces after the Secretary's final decision. *See Embry v.*

2  *Bowen*, 849 F.2d 418, 423-24 (9th Cir. 1988); *Booz*, *supra*, 734 F.2d at 1380.

3      Plaintiff alleges that the new evidence bears directly and substantially on the matter in

4  dispute and there is a reasonable probability that the evidence would have changed the outcome

5  of the determination.  She argues that good cause exists because the Commissioner's actions

6  precluded her from supplying the requested information.

7      Even assuming the new evidence is material, Plaintiff has not demonstrated good cause.

8  Even if Plaintiff's claim of ALJ error was correct, there is no explanation as to why she did not

9  present the evidence to the Appeals Council during the administrative proceeding.[5]

10 B.   RFC Assessment

11     Plaintiff contends that the RFC assessment is not supported because (1) the ALJ

12 improperly rejected the opinions of treating physicians Dr. Dunnington and Dr. Diamond; and (2)

13 the ALJ did not properly reject Plaintiff's allegations of pain.

14     RFC is an assessment of an individual's ability to do sustained work-related physical and

15 mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

16 week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only functional

17 limitations and restrictions which result from an individual's medically determinable impairment

18 or combination of impairments.  SSR 96-8p.  In assessing a claimant's RFC, the ALJ may rely

19 upon the State Agency physician's findings as to claimant's ability.  20 C.F.R. §§ 404.1513(c),

20 404.1527(f)(2)(i), 416.913(c), 416.927(f)(2)(i).

21     1.   *Treating Physicians' Opinions*

22     It is true that the medical opinion of a claimant's treating physician is entitled to "special

23 weight." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988); *Valencia v. Heckler*, 751 F.2d

24 1082, 1088 (9th Cir. 1985).  Reliance on the opinion of the treating physician is based not only

25 on the fact that he is employed to cure but also on his greater opportunity to observe and know

26 the patient as an individual.  However, a treating physician's opinion is not conclusive as to a

27

28     [5] The request for review of the ALJ's decision is dated July 1, 2003, and includes instructions on submitting additional evidence.  AR 7.  The Appeals Council denied review on September 17, 2003.  AR 4-6.

physical condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751, and *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the rejection.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

        a.    Dr. Dunnington

Plaintiff contends that the ALJ offered insufficient reasons for rejecting the April 14, 2003, opinion of Dr. Dunnington.

In his decision, the ALJ explains:

Little weight is afforded to the treating physician form (which appears on the attorney's letterhead) at 15F.  I also asked the claimant's representative to get clarification on that (e.g. duration, basis, signs, symptoms, and explain what "not consistent" concentration means, explain what "restricted" stooping, bending, squatting, and reaching means, and to explain what "periodic left upper extremity use" means, etc.).  The record was held open for this information as well, through the date of this decision, but no clarification was provided.  Therefore, I have given little weight to these opinions (*Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998).

AR 17.

Plaintiff contends that "much of what the ALJ claims requires clarification is clear from the treatment records or from the assessment itself."  Opening Brief, at 8.  For example, Plaintiff suggests that the duration of the limitations is clear because Dr. Dunnington "very clearly" states that the limitations have existed since before Plaintiff's first visit with Dr. Dunnington on February 1, 2001.  AR 512.  Plaintiff also contends that his opinion is based on his diagnosis and treatment history, and that the signs and symptoms are found in his treatment notes and are summarized in the diagnosis.

The ALJ set forth specific and legitimate reasons for rejecting the opinion.  First and foremost, the ALJ was entitled to give this report little weight.  A brief and conclusory form opinion which lacks supporting clinical findings is a legitimate reason to reject a treating physician's conclusion. *Batson v. Barnhart,* 359 F.3d 1190, 1995 (9th Cir. 2004); *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Second, although Plaintiff argues to the contrary, the ALJ allowed her an opportunity to correct the stated deficiencies.  The explanation in the

1  decision is simply a restatement of the discussion at the hearing.  Counsel was aware of the

2  ALJ's concerns and had an opportunity to produce clarifying evidence.

3        Rather than rely on Dr. Dunnington's limitations, the ALJ relied on the opinions of

4  consultive examiner Dr. Dhiman and the State Agency physician.  In assessing a claimant's RFC,

5  the ALJ may rely upon the state agency physician's findings as to claimant's ability.  20 C.F.R.

6  §§ 404.1513(c), 404.1527(f)(2)(i), 416.913(c), 416.927(f)(2)(i); *Tonapetyan v. Halter*, 242 F.3d

7  1144, 1149 (9th Cir. 2001) (consultive examiner's opinion is substantial evidence).  The Court

8  must uphold the ALJ's decision were the evidence is susceptible to more than one rational

9  interpretation.  *Magallanes,* 881 F.2d at 750.

10            b.      Dr. Diamond

11        Plaintiff next argues that the ALJ improperly rejected the limitations set forth by Dr.

12  Diamond in her April 2003 opinion.

13        The ALJ explained:

14            The claimant's attorney provided a check the blocks mental evaluation form
      completed by a treating physician on the day of the hearing.  I asked him to get
15      clarification of the reported limitations, including the doctor's qualifications, the basis for
      the decision, and whether the limits were based on objective findings or claimant's
16      subjective allegations.  I held the record open through the date of this decision, but
      received no clarification.  Therefore, little weight is given to this form as it lacks the
17      requested information.  Additionally, it is internally inconsistent.  For example, the doctor
      checked "none" on limitations regarding the ability to remember work-like procedures,
18      but also checked "moderately limited" (the second most severe limit of the choices
      provided) in "the ability to understand and remember very short and simple instructions."
19      This form is also inconsistent with some of claimant's own treatment records (see e.g.
      "mental status exam within normal limits," Exhibit 6F, page 14); "no difficulty with
20      social functioning" (at Exhibit 5F, page 5 - when compared to Exhibit 16F, page 2
      "moderately limited in the ability to work in coordination within proximity to others
21      without being distracted by them").

22  AR 17.

23        Plaintiff asserts that the assessment was consistent with Dr. Diamond's treatment notes

24  and argues that it was not internally inconsistent.  Again, however, the ALJ set forth specific and

25  legitimate reasons for rejecting the opinion.  As explained above, the ALJ was entitled to give

26  this report little weight.  A brief and conclusionary form opinion which lacks supporting clinical

27  findings is a legitimate reason to reject a treating physician's conclusion.  *Batson v. Barnhart,*

28  359 F.3d 1190, 1995 (9th Cir. 2004); *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Second, although Plaintiff argues to the contrary, the ALJ allowed her an opportunity to correct the stated deficiencies.  The explanation in the decision is simply a restatement of the discussion at the hearing.  Counsel was aware of the ALJ's concerns and had an opportunity to produce clarifying evidence.

Additionally, the ALJ noted "inconsistencies" in Dr. Diamond's assessment.  Although Plaintiff argues that this is "nitpicking," the Court must uphold the ALJ's decision were the evidence is susceptible to more than one rational interpretation.  *Magallanes,* 881 F.2d at 750.

2.    *Credibility Determination*

Finally, Plaintiff contends that the ALJ did not properly reject Plaintiff's subjective complaints of pain.  Specifically, she argues that the ALJ gave improper weight to her daily activities and "sporadic work record."

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  "The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimaint's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains."  *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing."  *Id.*

1    The ALJ determined that Plaintiff's subjective complaints were not as severe as alleged.

2    AR 17.  He first noted Plaintiff's testimony regarding her daily activities was inconsistent with

3    the level of disability she alleged.  AR 17.  He explained that Plaintiff lives alone with her 16

4    year old daughter, takes care of all of her own personal needs, does simple meal preparation

5    twice a day, cooks three times per week, crochets two hours per day, and walks one hour in a day

6    (in 20 minute blocks).  AR 17.  He also noted that Plaintiff drives five times per week, goes out

7    to eat twice a month, and attends church three times a month.  AR 17.

8    Plaintiff argues that the ALJ made a conclusory statement when he determined that these

9    activities were inconsistent with the level of disability alleged, and argues that there is nothing

10   about any of these activities that establishes the ability to work over an eight hour period.

11   Plaintiff's daily activities were, however, a proper area of inquiry.  *Thomas,* 278 F.3d at 958.

12   Plaintiff also misunderstands the ALJ's use of her daily activities.  Contrary to her assertion, the

13   ALJ did not cite her activities to support a finding that she could work eight hours a day.  Rather,

14   the ALJ cited her activities as a detraction from her credibility.  In other words, Plaintiff's

15   testimony about her daily activities contradicted her testimony and allegations about her

16   disability.

17          Plaintiff further argues that the ALJ improperly considered her sporadic work history in

18   evaluating her credibility.  She contends that she "earned quarters in 9 of the 12 years proceeding

19   her date of disability," and that her testimony that she worked from 1989 to October 2000 is

20   consistent with her earnings record.  Plaintiff also contends that it was improper for the ALJ to

21   rely on her work record without first inquiring into the reasons for non-employment during the

22   periods with no earnings history.

23          In explaining that Plaintiff had a sporadic work history, the ALJ cited to the Social

24   Security report showing that Plaintiff had substantial gainful activity in only seven of the fifteen

25   years preceding her date of disability.  AR 17.  While the ALJ is allowed to consider Plaintiff's

26   work history in his credibility analysis, he should not have determined that Plaintiff's work

27   history detracted from her credibility without a more in depth examination of her work record.

28   *Thomas*, 278 F.3d at 959 (holding that claimant's "extremely poor work history" shows that she

1  has little propensity to work and negatively affects "her credibility regarding her inability to

2  work").

3         This improper reason does not, however, render the ALJ's credibility analysis incorrect.

4  *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility

5  determination even though one reason may have been in error). The ALJ made specific findings,

6  other than Plaintiff's work record, to allow the Court to determine that he did not arbitrarily

7  discredit Plaintiff's complaints. He properly considered Plaintiff's daily activities. In other

8  portions of his decision, he properly noted that Plaintiff's treatment was conservative (mostly

9  physical therapy, medications and home exercises) and that Plaintiff generally responded well to

10 treatment. AR 240, 249, 317, 322, 323, 333, 353, 361, 444, 445, 447, 469, 494. Finally, the ALJ

11 noted that in March 2001, after she stopped working due to her alleged disability, she was treated

12 for a fall from a horse. AR 15. Indeed, medical records indicate that Plaintiff was seen in the

13 emergency room after falling from a bucking horse. AR 361. Each of these factors detracts from

14 Plaintiff's subjective allegations, and supports the ALJ's credibility finding.

15                             **RECOMMENDATION**

16        Based on the foregoing, the Court finds that the ALJ's decision is supported by

17 substantial evidence in the record as a whole and is based on proper legal standards.

18 Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision

19 of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for

20 Defendant Jo Anne B. Barnhart and against Plaintiff Janelle L. Davis.

21        These findings and recommendations will be submitted to the Honorable Oliver W.

22 Wanger pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fifteen (15) days after

23 being served with these findings and recommendations, the parties may file written objections

24 with the court. The document should be captioned "Objections to Magistrate Judge's Findings

25

26

27

28

1    and Recommendations."  The parties are advised that failure to file objections within the

2    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

3    F.2d 1153 (9th Cir. 1991).

4           IT IS SO ORDERED.

5    **Dated:    July 12, 2005**                    _____/s/ Dennis L. Beck_____
     3b142a                                         UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28